IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 11-cv-00567-RBJ-MJW

HENRY TEIGEN,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF
WATER COMMISSIONERS,

     Defendant.

---

## ORDER

---

     Plaintiff Henry Teigen, a 63 year-old attorney, brings claims against his former employer, the City and County of Denver Acting by and through its Board of Water Commissioners ("Denver Water"), arising out of his termination from his position as Chief of Distribution and Property Management.  Mr. Teigen asserts five claims for relief: age discrimination, wrongful termination due to age, wrongful termination as violation of due process, race/national origin discrimination, and hostile work environment.  This matter is before the Court on Denver Water's motion for summary judgment regarding all claims for relief.  [#29].

### Facts

     Mr. Teigen was an in-house attorney with Denver Water's Legal Division from November 27, 1978 until March 27, 2004, when he became the Chief of Distribution and Property Management in Denver Water's Engineering Division.  As the Chief of Distribution and Property Management, Mr. Teigen supervised approximately 44 employees in five different

sections, which included the Recreation Section.  The Recreation Section, which is managed by

Neil Sperandeo, administers all matters related to public recreation on Denver Water's properties

throughout the State of Colorado.  Mr. Teigen was terminated from his position with Denver

Water in November, 2009.  At the time of this termination, Mr. Teigen reported directly to the

Director of Engineering, Robert Mahoney.

Denver Water claims that Mr. Teigen was fired for unethical conduct after he abused his

discretion as a hiring supervisor to help his daughter's boyfriend get a job within his own chain

of command.  In the summer of 2009, Mr. Sperandeo wanted to hire a temporary laborer to work

at Denver Water's Kassler facility to help Terri Doolittle, an employee at the Recreation Section

and one of Mr. Sperandeo's employees.  In the past, college interns generally filled this role in

helping Ms. Doolittle, but both Ms. Doolittle and Mr. Sperandeo had been unhappy with intern

performance.  With Mr. Teigen's support, Ms. Doolittle and Mr. Sperandeo obtained

authorization to stop using interns and hire a temporary laborer who could work beyond the

summer months.

Ultimately, James Steele, Mr. Teigen's daughter's boyfriend, was hired for the position.

The parties dispute the circumstances surrounding the hiring process.  Mr. Teigen maintains that

he had little confidence in Mr. Sperandeo's ability to hire the right person, and that he

recommended Mr. Steele for the temporary laborer position because he could "get the job done."

Pl.'s Depo. [#32-1] at 57:3-5.  Mr. Teigen says he was not actively involved in the interview,

although he admits he was present during the interview because he "came by" when he went to

get some coffee.  *Id*. at 59:20-60:6.  Mr. Teigen also maintains that he did not know the

seriousness of his daughter's relationship with Mr. Steele at the time Mr. Steele was hired.  *Id*. at

68:19-23.

Denver Water paints a different picture, claiming that Mr. Teigen sought to hire Mr. Steele without any interview after telling Mr. Sperandeo that he had a "family friend" who would be a good candidate for the position.  Sperandeo Aff. [#29-4] ¶11.  Mr. Sperandeo learned Mr. Steele was in the process of already being hired when a human resources representative, Alice Montez, contacted Mr. Sperandeo regarding processing Mr. Steele's Requisition for Employee form.  Montez Aff. [#29-5] ¶3.  Mr. Sperandeo says he was "shocked" that anyone had been selected for the position and sought to first interview Mr. Steele, as he typically handled employee hiring when he would be the employee supervisor. [#29-4] ¶14.  Ms. Montez arranged for an interview to take place, and Mr. Teigen was present and participated in this interview, even though he had never previously been involved in Mr. Sperandeo's hiring of laborers.  [#29-4] ¶ 16; Doolittle Aff [#29-7] ¶ 4.  All parties agree that the interview went well, and Mr. Steele was hired.

Mr. Steele began working for Denver Water on September 9, 2009.  Shortly thereafter, both Ms. Doolittle and Mr. Sperandeo learned that Mr. Steele was dating Mr. Teigen's daughter, that Mr. Steele intended to marry his daughter, and that Mr. Steele and Mr. Teigen's daughter were about to start living together.  Doolittle Aff. [#29-7] ¶6; Sperandeo Aff. [#29-4] ¶ 21.  Mr. Sperandeo says he felt "sick," because he worried that the hiring process violated Denver Water's anti-nepotism policy, which precludes the hiring of family members.  *Id*. ¶20.  Mr. Sperandeo was also upset because he felt Mr. Teigen had not been upfront regarding his relationship with Mr. Steele.  However, because Mr. Steele was a temporary worker and a good worker, Mr. Sperandeo did not express these concerns.  *Id*. ¶ 23.

Approximately six weeks later, Mr. Teigen spoke with human resources representative Kathy Balu about Mr. Steele's position.  According to Mr. Teigen, the conversation was

informational about how to reclassify that position so it would no longer be temporary, because temporary positions cannot be held for more than one year.  [#32-1] at 72.  Mr. Teigen says that the job's classification was based upon having interns in the past, and he was trying to help Ms. Doolittle by seeking to change it.  However, Ms. Balu says the conversation was about how to reassign a temporary employee to a higher level position and increase his pay from $14.75 per hour to $17.13 per hour.  Balu Aff. [#29-1]  ¶ 8; Email [#29-9].

Around the same time, Mr. Sperandeo told Mr. Teigen that he hoped to keep Mr. Steele employed into 2010 because Ms. Doolittle was pleased with his work.  In response, Mr. Teigen told Mr. Sperandeo to ask Human Resources about upgrading Mr. Steele's pay and position. [#29-4] ¶¶ 25-26.  When Mr. Sperandeo did so, the human resources representative wanted to know why, and Mr. Sperandeo suggested "maybe it's because James Steele is going to be his future son-in-law." *Id*. ¶ 27.  Ms. Montez and Ms. Balu reviewed Mr. Steele's personnel filing and noticed that Margaret Teigen was listed as Mr. Steele's emergency contact name and that he used her address on both his employment application and on his emergency contact form.  [#29-1] ¶ 11; Montez Aff. [#29-5] ¶ 12.

Ms. Balu says she was worried that hiring Mr. Steele violated Denver Water's policies, and she sent an email to the Director of Human Resources.  [#29-9].  On October 28, 2009, Mr. Teigen met with Mr. Mahoney, Mr. Sperandeo, Ms. Balu and others to discuss the situation.  No one seemed to think that Mr. Steele's hiring constituted a technical violation of the anti-nepotism policy, but it had the appearance of impropriety, because Mr. Steele was not hired as the result of a competitive process, and because he worked in Mr. Teigen's chain of command.  Balu Aff. [#29-1] ¶ 13.  The parties determined it was no longer appropriate for Mr. Steele to work in Mr. Teigen's chain of command.  Had Mr. Steele been married to Mr. Teigen's daughter at the time

4

he was hired, his hiring would have been a violation under the anti-nepotism policy, which prohibits the hiring of a second Denver Water employee into the same "working unit" as another relative.  Personnel Policy § 2-14-(6) [#29-12] at 8.  Although Mr. Teigen suggested they resolve the problem by just having Mr. Steele report to Mr. Mahoney, Mr. Mahoney did not want to go to such lengths to accommodate a temporary employee who had been employed for less than two months.  [#29-3] ¶11.  Mr. Mahoney requested written statements of the events from Mr. Teigen and Mr. Sperandeo.  Mr. Mahoney also requested an internal audit to investigate whether any of Denver Water's personnel policies were violated.

The internal audit was conducted between November 2 and November 9, 2009.  [#29-15].  The auditors determined that Mr. Teigen had violated three sections of the personnel policies: (1) the duty to act in the public interest pursuant to section 2-12-(1); (2) conflict of interest pursuant to section 2-12-(2); and(3) general provisions governing temporary and project employees under section 5-2-(2).  [#29-12].  Although Mr. Teigen's violation of section 5-2-(2) was for the failure to hire a temporary employee pursuant to a competitive process, the auditors noted that a non-competitive hiring practice was so common that it would be difficult to apply this rule strictly.  [#29-15] at 1.  The other two violations were viewed more harshly.

The auditors concluded that Mr. Teigen violated the conflict of interest section by taking "direct official action on a matter in which an immediate family member had a substantial financial interest."  *Id*. at 3.  They also felt that Mr. Teigen violated his duty to act in the public interest and to avoid actual impropriety as well as the appearance of impropriety: "Mr. Teigen manipulated the hiring process to ensure that his daughter's fiancé was the only candidate who might be selected for the position and concealed the personal relationship from the hiring manager, HR, and the Division Director."  *Id*.  The auditors seemed to believe, and defendant

certainly believes, that Mr. Teigen was not truthful during the investigation.  "Mr. Teigen's statements regarding his participation in the interview process also appear to be intended to suggest less involvement in the hiring of Mr. Steele than he actually had."  [#29-15].  Mr. Teigen disputes the accuracy of the internal audit investigation and how his actions were characterized, although he does not specify what he thinks is inaccurate or unfair.

On November 13, 2009, Mr. Teigen received a notice of corrective action, which listed the policies Mr. Teigen was said to have violated and included the auditor's report and a memo from Mr. Mahoney.  [#29-4].  A division conference was held on November 20 to discuss the notice of corrective action, and Mr. Mahoney issued his final decision on November 23.  [#29-18].  Mr. Mahoney determined that Mr. Teigen violated the employee code of ethics and other policies, that he could no longer trust Mr. Teigen, and that he could not allow Mr. Teigen to continue to be a supervisor.  *Id*. at 6.  Mr. Teigen appealed Mr. Mahoney's decision, and a two-day evidentiary hearing was held in which Mr. Teigen was represented by counsel.  [#29-20].  The hearing officer determined that Mr. Teigen received sufficient pre-termination due process, that his conduct violated Denver Water policies, that Mr. Teigen lied during the investigation, and that his termination was for cause.  *Id*.  This decision was issued on March 1, 2010.  Mr. Teigen did not appeal this decision.  The present action was filed approximately one year later.

**<u>Standard</u>**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  A

fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### Conclusions

#### Age Discrimination and Wrongful Termination: claims one and two

Plaintiff's first and second claims for relief are under an age discrimination theory. Although both claims are pled under Title VII, defendant correctly points out that they should have been pled under the Age Discrimination and Employment Act ("ADEA"). Because trial is quickly approaching, and because both parties have briefed the summary judgment issue under the ADEA, the Court believes it to be more efficient to consider the merits of the ADEA claim instead of dismissing without prejudice.

A plaintiff establishes a prima facie case of age discrimination if he shows that he was "(1) within the protected class of individuals 40 or older; (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age." *Adamson v. Multi Community Diversified Serv.*, 514 F.3d 1136, 1146 (10th Cir. 2008). Defendant does not dispute that Mr. Teigen can satisfy the first, third, and fourth prongs. Rather, Denver Water argues that plaintiff cannot satisfy the second prong, because he was terminated for unsatisfactory work performance. However, the reason for his termination is precisely the issue in this case. Additionally, there is no dispute that Mr. Teigen was a satisfactory employee for thirty

years prior to the events at issue. As a result, the Court finds that Mr. Teigen has established his

prima facie case under the ADEA.

If the plaintiff successfully carries his burden of establishing a prima facie case of age

discrimination, the defendant then has the burden of offering a legitimate non-discriminatory reason

for terminating the plaintiff. *See id.* Defendant had proffered such a reason, i.e., that Mr. Teigen

violated the employee code of ethics and other policies by having his daughter's boyfriend hired

within his chain of command and by failing to disclose that Mr. Steele was his daughter's boyfriend.

As a result, the burden shifts back to the plaintiff to offer evidence that age was a determining factor

in motivating the challenged decision, essentially that the reason given was pretextual. *See Ingels v.*

*Thiokol Corp.,* 42 F.3d 616, 621 (10th Cir. 1994). "A plaintiff produces sufficient evidence of

pretext when she shows such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not

act for the asserted non-discriminatory reasons." *Jones v. Oklahoma City Public Sch.*, 617 F.3d 1273

1280 (10th Cir. 2010)(internal quotations omitted).

Mr. Teigen's pretext argument is largely conclusory. He states, the "policy violation did not

rise to the level of requiring termination and Defendant has failed to show that similarly situated

employees were treated similarly to Plaintiff." [#32] at 7. Plaintiff has not provided any evidence of

other similarly situated employees. In fact, in plaintiff's briefing regarding his age discrimination

claims, he does not provide any evidence suggesting that age was a determining factor in his

termination. Mr. Teigen's only evidence suggesting even a general age bias by Mr. Mahoney is

raised in his hostile work environment argument, in which plaintiff cites to deposition testimony

regarding some of Mr. Mahoney's past comments. However, none of these comments is specifically

tied to Mr. Teigen's employment, and "[i]solated comments, unrelated to the challenged action, are

insufficient to show discriminatory animus in termination decisions." *Rea v. Martin Marietta Corp.*,

29 F.3d 1450, 1457 (10th Cir. 1994)(explaining that a plaintiff needs to demonstrate a nexus between statements and the decision leading to her termination in an ADEA claim).  Rather, Mr. Teigen's argument seems to be that he disagrees that he violated any policy, and that even if he did violate a policy, it did not rise to a terminable offense.  Even if this were true, it does not follow that Mr. Teigen has been discriminated against under the ADEA when he offers no other evidence to support such discrimination.

Mr. Teigen also offers no evidence to suggest "implausibilities, inconsistencies, incoherencies, or contradictions" in Mr. Mahoney's decision to terminate his employment.  Mr. Mahoney believed Denver Water policies had been violated, he asked for an internal audit, and the audit concluded that policies were violated.  Although Mr. Teigen disputes the "characterization of his actions" in the audit, his claim that the report is inaccurate does not create an inconsistency.  Ultimately, Mr. Mahoney discussed the auditor report with Mr. Teigen, Mr. Mahoney issued his decision, and Mr. Teigen appealed the decision, which was later affirmed by a hearing officer after hearing two days of evidence.  Instead of suggesting implausibilities or contradictions, the evidence supports Mr. Mahoney's termination decision.  Because Mr. Teigen has failed to offer any evidence to suggest that age was a determining factor motivating Mr. Mahoney's decision to terminate him, the Court grants summary judgment in favor of Denver Water on Mr. Teigen's first and second claims for relief for age discrimination.

Due Process: claim three.

Plaintiff also alleges a violation of his due process rights.  Although plaintiff again failed to plead this claim correctly under the Fourteenth Amendment (and instead appears to plead it under Title VII), the Court in the circumstances elects considers the claim on its merits rather than on the pleader's mistakes.

A claim for violation of one's procedural due process rights under the Fourteenth Amendment requires a plaintiff to show that he (1) had a protected interest to which due process protection was applicable and (2) that the plaintiff did not receive an adequate level of process. *See Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996). Denver Water does not dispute that Mr. Teigen had a property interest in his public employment. As a result, the issue here is whether the process afforded to Mr. Teigen was sufficient.

Plaintiff argues he was effectively terminated on November 13, 2009 when he received the notice of corrective action. He says he was locked out of his computer, he could not use his phone, and he was forced to turn over his badge and other work items. When Mr. Teigen said he did not have his beeper with him and would have to return it on Monday, Mr. Mahoney responded, "You're not coming in on Monday." [#32-2] at 233:16-234:21. A division conference was held one week later to discuss the notice, but Mr. Teigen claims that Mr. Mahoney had made up his mind and cut him off when he tried to speak. *Id.* at 244:5-8. At the end of the conference, Mr. Mahoney told plaintiff that he could "find a place in the Engineering Division where you don't supervise anybody and we'll move you there." *Id.* at 248:2-17. Mr. Teigen says he did not believe Mr. Mahoney. Finally, Mr. Teigen argues that he was precluded from presenting evidence to the hearing officer with respect to his discrimination claim

When a government employee is terminated for cause, courts examine the pre-termination and post-termination process that the employee received. *See Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996). The adequacy of pre-termination procedures depends on whether the employee had "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 627 (internal quotations omitted).

After the October 28 meeting to discuss Mr. Steele's hiring, at which Mr. Teigen was present, Mr. Mahoney asked for a statement from Mr. Teigen, which Mr. Teigen provided the next day. [#29-13]  Mr. Mahoney also asked for an internal audit, and the audit report reflects an interview with Mr. Teigen. *Id*. at 4.  The Court finds Mr. Teigen was on notice that the hiring of Mr. Steele was being investigated, and he had an opportunity to present his side of the story, both to Mr. Mahoney directly and to the auditors.

Mr. Teigen claims he was terminated on November 13, 2009 when he was provided with the notice of corrective action as a result of the internal auditor's report. [#29-24].  However, the notice specifically provided for an upcoming division conference and indicated that Mr. Teigen would be suspended with pay until corrective action was to be delivered. *Id*. at 1.  Mr. Teigen's conference was held on November 20, which is the conference at which Mr. Teigen claims Mr. Mahoney had already made up his mind. [#32-2] at 248:2-17.  Mr. Mahoney says that he intended to reconvene a few days later to discuss possible outcomes, but that Mr. Teigen did not attend after leaving a voicemail indicating he had done nothing wrong.  Mahoney Aff. [#29-3] ¶ 19; Termination Letter [#29-18].  Later that day, Mr. Mahoney issued his decision terminating Mr. Teigen's employment. [#29-18].

Mr. Teigen appealed the decision, and a two-day evidentiary hearing was held at which Mr. Teigen was able to call and cross-examine witnesses and was represented by counsel.  Mr. Teigen argues he was precluded from presenting evidence about his discrimination claim. However, Mr. Teigen did not to assert any discrimination claim as a defense at the hearing. [#33-1] at 499.  On the contrary, his lawyer specifically advised the hearing officer that age discrimination was not before him from Mr. Teigen's perspective. *Id.*  Therefore, the argument is entirely lacking in merit.

The hearing officer issued a sixteen-page decision and concluded that Mr. Teigen had received sufficient pre-termination due process and was terminated for cause.  Although Mr. Teigen had to turn over his keys and other work items on November 13, the hearing officer determined that Mr. Teigen knew he was not being terminated on that date.  [#29-20] at 7.  The hearing officer reasoned that as an attorney of thirty years for Denver Water, Mr. Teigen knew that the notice did not constitute termination, that it was the beginning of procedure to determine if any discipline would occur, and that a division conference would follow.  *Id.*  In fact, Mr. Teigen sought additional time to prepare for this conference, as the conference was moved from November 18 to November 20 at his request.  *Id.*

Ultimately, Mr. Teigen had the opportunity to participate in the internal audit, the division conference, and the two-day hearing with the hearing officer.  Mr. Teigen was not terminated until the director decision letter issued on November 23, 2009.  The Court concludes that Mr. Teigen received adequate pre-termination and post-termination process.  As a result, the Court grants summary judgment as to this claim.

National Origin Discrimination Claim/Race Discrimination: claim four.

Defendants also seek summary judgment on Mr. Teigen's fourth claim for relief, in which Mr. Teigen alleges that he was born in Panama, that he was subjected to adverse terms and conditions of employment, and that he was marginalized from his duties as a manager.  Compl. ¶¶ 53-61.

Like a claim under the ADEA, a Title VII claim for national origin discrimination is also analyzed under the burden-shifting framework originally outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 902-04 (1973).  "[T]o establish a prima facie case of discriminatory discharge on the basis of national origin, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not

eliminated after such discharge." *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004).

I question whether Mr. Teigen belonged to a protected class.  He was born in Panama. However, according to him, his father was a U.S. citizen stationed in Panama, and his mother was a British subject.  It is not at all clear on the record whether Mr. Teigen's father was Hispanic or whether he claims to be Hispanic (other than the fact that his complaint to the Colorado Civil Rights Division [#29-22] asserts discrimination "based on my race/national origin (Hispanic/Panamanian)."  However, for present purposes, the Court will assume that plaintiff has sufficiently established a prima facie case.

Because Denver Water has offered a legitimate non-discriminatory reason for firing Mr. Teigen, it is Mr. Teigen's burden to establish that Denver Water's proffered reason is pretext for national origin discrimination.  *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1167 (10th Cir. 2000).  Mr. Teigen can show pretext by establishing "either that a discriminatory reason more likely motivated the employer or…that the employer's proffered explanation is unworthy of credence." *Id*. As previously discussed, Mr. Teigen has failed to establish that Denver Water's proffered explanation is unworthy of credence.   Mr. Teigen also fails to offer any evidence to suggest that a discriminatory reason more likely motivated Mr. Mahoney.  In fact, it is doubtful as to whether Mr. Mahoney even knew Mr. Teigen was born in Panama.  Mr. Mahoney says that no one ever told him that Mr. Teigen was born in Panama, he did not know Mr. Teigen's national origin, and he had never even contemplated Mr. Teigen's national origin.  Mahoney Aff. [#29-3] ¶ 21.  Even Mr. Teigen only "thinks" Mr. Mahoney knew he was from Panama because he "might have" told Mr. Mahoney where he was born and because it is in his personnel file.  Teigen Depo. [#29-21] at 216:4-218:18.  The Court concludes that Mr. Teigen has failed to offer evidence that would establish national origin pretext.  Accordingly, the Court grants summary judgment as to this claim.

Hostile Work Environment: claim five.

Plaintiff's claim for hostile work environment alleges that he was "subjected to discriminatory conduct by Mr. Mahoney," that the conduct was directed at him because of his age and race, and that Denver Water failed to implement reasonably prompt and appropriate corrective action. Compl. ¶¶62-70. Defendant first contends that Mr. Teigen failed to exhaust his administrative remedies when he filed his EEOC charge because he failed to allege any facts to support his hostile work environment claim. As a result, Denver Water maintains this Court does not have jurisdiction. Plaintiff ignored this basic argument in his response.

"Exhaustion of administrative remedies is a 'jurisdictional prerequisite' to suit under Title VII," *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996). In his CCRD charge plaintiff checked the boxes for national origin and age discrimination. [#29-2]. There is no check box for "hostile work environment," although there is a box for "other." However, failure to mark a box for a particular type of employment discrimination is not necessarily dispositive. Rather, "it creates a presumption that [the complainant] was not asserting claims represented by boxes not checked," which could be "rebutted by the text of [the] claim." *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1260 (10th Cir. 1998).

The hostile work environment alleged here was created by a history and pattern of remarks and actions attributed to plaintiff's supervisor who is the individual who fired him. He offers at least some evidence that the individual has over an extended period of time made inappropriate and offensive comments to him and to others concerning matters pertaining to national origin and age. The general thrust of the text of his CCRD complaint concerns matters of national origin and age, including treatment and comments not limited to him. [#29-22]. Defendant cites to *Shikles v. Spring/United Mgmt. Co.*, 426 F.3d 1304, 1309 (10th Cir. 2005), in which the court held that a plaintiff must cooperate with the EEOC in order to exhaust administrative remedies under the ADEA. However, there is no allegation here that Mr. Teigen refused to cooperate with the CCRD.

14

Given the totality of the circumstances, the Court will give Mr. Teigen the benefit of the doubt and find that he sufficiently exhausted his administrative remedies.

"To survive summary judgment on a claim alleging a racially hostile work environment, the plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of her race or national origin." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012). *See also MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005)(applying the same test to hostile work environment claims stemming from the ADEA).  The applicable test uses a dual standard, asking both "whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended." *Hernandez*, 684 F.3d at 957.  Mr. Teigen's support for his hostile work environment claim includes the following:

- At an employee awards luncheon, Ms. Valdez told Mr. Mahoney to remove a picture from his power point presentation that depicted a truck of migrant workers.  Mr. Mahoney planned to joke that the picture was Rene Padilla's (a Hispanic employee) family outing.  [#32-3] at 16:20-18:5.  When asked if she could think of any other discriminatory comments by Mr. Mahoney, Ms. Valdez could not.  *Id*. at 18:8-9.

- Mr. Teigen lists several former employees whom he believes were "terminated or forced out" because of race or age.  [#32-2] at 166:22-168:19, 177:1-7, 178:14-18, 184:7-16, 186-187:8.  He also claims that a "disproportionate number of people that were terminated…in the last 20 years have been minorities."  *Id*. at 190:9-11.  However, this is "just from what [he has] seen."  *Id*. at 190:13.

- At a monthly staff meeting, Mr. Teigen says Mr. Mahoney would show slides of historic photos of the Water Department and would point to people in pictures saying "there's Teigen" or other older employees over 50.  Mr. Teigen felt he was being mocked.  [#32-1] at 137:15-140:17.

- Mr. Teigen says Mr. Mahoney pressured him to marginalize a supervisor so that a younger employee could assume that responsibility.  *Id*. at 145:17-24.

- Ms. Valdez felt Mr. Mahoney created an environment of leaving people "out of the loop" if they weren't part of his "core group," which included younger people who did not directly report to him.  [#32-3] at 11:6-13:3.

- Ms. Valdez heard Mr. Mahoney describe Mr. Teigen as being in "retirement mode." [#32-3] at 16:4-6.  Mr. Teigen also claims that Mr. Mahoney instructed him to mentor Amy Turney, who became his replacement. *Id*. at 198:3-4.

- In early 2009, Mr. Teigen says Mr. Mahoney said he "really wished he could get rid of" three employees who had "been here too long." *Id*. at 131:15-23.  Mr. Teigen felt this to be an overt statement of hostility towards his age group. *Id*. at 134:15-18.

"In the typical case, the question is whether the quantity, frequency, and severity of the racial, ethnic, or sexist slurs create a work environment so hostile as to discriminate against the minority employee." *Trujillo*, 157 F.3d at 1214 (quoting *Vore v. Indiana Bell Tel. Co.*, 32 F.33d 1161, 1164 (7th Cir. 1994).  Mr. Teigen cannot meet his burden to establish a pervasively hostile work environment "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs." *Herrera v. Lufkin Indust., Inc.*, 474 F.3d 675, (10th Cir. 2007)(quoting *Chavez v. New Mexico*, 397 F.3d 826, 832)(10th Cir. 2005)).  *See also MacKenzie*, 414 F.3d at 1280 ("[C]ourts judging hostility should filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of age-related jokes, and occasional teasing.").

Although the comments attributed to Mr. Mahoney, if they occurred, could be viewed as isolated incidents or sporadic, albeit inappropriate, slurs, "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *Herrera*, 474 F.3d at 680 (quoting *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 923 (10th Cir. 2001)).  There is a question in my mind as to what the remedy for the alleged misconduct would be if Mr. Teigen was terminated for cause.  However, that question was not squarely put before the Court by the pending motion and was not directly addressed in the

16

parties' briefs.  Therefore I do not address it here.  The Court denies summary judgment as to this claim.

### Order

Motion #29 is GRANTED IN PART AND DENIED IN PART.  The Court grants the motion as to claims one through four and enters judgment dismissing those claims with prejudice.  The Court denies the motion as to claim five concerning an allegedly hostile work environment.

DATED this 9th day of August, 2012.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge